This suit was instituted in the court below by appellee, the Houston Texas Central Railroad Company, on October *Page 131 
31, 1895, against the Railroad Commission of Texas, under the provisions of the act, approved April 3, 1891, providing for the creation of a Railroad Commission, for the purpose of having declared unreasonable, unfair, and unjust the rules and regulations established by said Commission in reference to the compression and concentration of cotton, as shown by a copy of such rules and regulations set forth in plaintiff's petition, and praying judgment canceling, annulling, and setting aside said rules and regulations in so far as the same applied to appellee, and perpetually enjoining the Railroad Commission of Texas from enforcing the same. The grounds of the action were, in effect: first, that the Railroad Commission of Texas was without power and authority, under the law, to establish the rules and regulations in question; second, that the rules and regulations were unreasonable, unfair, and unjust in their application to the plaintiff; and third, that the Railroad Commission was applying and seeking to enforce the application of such rules and regulations to the transportation of cotton from points within the State of Texas to points in other States and in foreign countries — interstate and foreign commerce. The grounds of the action were set out in detail in the plaintiff's original petition.
The defendant answered in due time by general and special exceptions, by pleading the general issue, and by special pleas which need not be stated here.
The case was tried before the court without a jury, and resulted in a judgment in favor of the plaintiff, granting the relief prayed for in plaintiff's original petition.
The first grounds urged in the attack upon the rules and regulations complained of were disposed of in an opinion by the Supreme Court adversely to the contention of appellee. We certified to the Supreme Court the question whether the Commission had the authority to make and promulgate the rules in question, and that court held that such power existed. Reference is made to the opinion of the court upon that question, and as the rules complained of are there fully stated we deem it unnecessary to set them out here, except to state that they, in effect, require railway companies transporting cotton, upon request of the shipper, to have it compressed at the initial point or at the nearest compress thereto on the line of route.
There is no force in the third objection urged to the rules, as it evidently was not the purpose that they should apply to interstate shipments, nor do the facts in the record show that any effort was made to give them such an application. The first finding of fact of the court below is against the appellee on this question, and such being the case we do not feel called upon to decide the question whether the Commission can apply its rules and regulations concerning the compression of cotton to interstate shipments.
The only question that remains for us to decide is that raised in the second objection to the rules and regulations — that is, whether they are unreasonable and unjust when applied to the line of road operated by appellee. *Page 132 
The court below filed conclusions of fact, which need not be fully repeated by us. From these facts the court concluded that the rules and regulations of the Commission concerning the compression of cotton were unjust and unreasonable when applied to the appellee.
The correctness of some of these findings is seriously questioned by appellant, and in view of the facts stated in the record, and of physical facts known to all men, we must differ with the court in some of its conclusions.
At the outset, before discussing the effect of the facts and the conclusions of the trial court, we desire to state what we understand to be a rule of law which should be observed in determining if these rules and regulations are reasonable or unreasonable, and which will partially control us in reaching a final conclusion and disposition of this case. This rule is that the determination of the question whether the rules and regulations are reasonable or not is a matter confided to the court as a question of law. The facts upon which the regulations are based and that surround it must be ascertained by the court or jury trying the case, but the effect of the facts in determining the character of the rules are questions for the court.
In the case of the City of Austin v. Cemetery Association,87 Tex. 338, in passing upon an ordinance of the city, the court said: "But whether the facts relied upon show the ordinance to be unreasonable or not is a question for the court."
The same rule, we think, should apply to the rules and regulations promulgated by the Commission. The power to make rules concerning subjects confided to it is as broad as that of a municipal corporation to pass resolutions and ordinances. Each alike affects and serves some public purpose and interest. Both act in a quasi legislative capacity, with additional functions resting upon the Commission partly judicial in character. Hence the reasons for the rule that places upon the court the duty to determine as a matter of law if an ordinance is or not reasonable should be applied in ascertaining a like question when the rules and regulations of the Commission are up for construction. In view of this principle, in determining the effect of the rules and regulations, we should consider all of the facts in the record, and give them such effect as they may be entitled to. This is not a case in which this court is undertaking to decide between conflicting evidence or to determine the credibility of certain testimony, and thereby usurping the province of the trial court to find the facts; but it is one in which this court feels authorized to differ with the trial court as to the effect to be given to certain facts found in the record, when considering all of the facts in their entire range bearing upon issues involved in the case. We do not undertake to reconcile a conflict in the evidence upon disputed points, but we claim, in a case of this character, the privilege of determining the effect to be given to all of the facts; and considering the facts in their strongest light favorable to the railway company, we may claim, as we will endeavor to show, that they do not warrant the effect given to them by the trial court. In other words, to simplify the proposition, we do not feel that we are bound by the findings or construction placed upon the facts by the trial court, as *Page 133 
his findings, in effect, are simply deductions drawn from all of the facts. Whether the rules are reasonable or unreasonable depends upon what effect a court will give to all of the facts bearing upon that question, and in the exercise of this function our jurisdiction equals that of the court below. Consequently, we are at liberty to ascertain the effect to be given to the facts and what they establish.
This much is said in view of the disposition we make of the case in reversing the judgment of the court below and rendering judgment in favor of appellant, as at one time we entertained a doubt, in reversing the case, as to the power of this court to go so far as to render a judgment differently from that rendered by the court below.
The court below found that the compresses along the line of appellee's road in the interior are able with due promptness to compress cotton to the density required by the Commission rules, and that these compresses afford reasonable protection from fire. We adopt this finding as correct, and also find that the cost and expense of unloading and loading cotton at the compress points on the line of road are borne by the compresses, without charge to the shipper or railway company. We also find that much more cotton can be loaded upon cars for transportation when compressed than would be the case if not compressed, as the compression of cotton to the density of 22 1/2 pounds per cubic foot, as required by the Commission rules, reduces its bulk nearly one-half.
The benefits to result in compressing cotton at the initial point of shipment, or the nearest compress reached after leaving, as required by the Commission rules, we find to be in reducing the bulk of the shipment, thereby placing the cotton in a condition to be transported with fewer cars and fewer trains, and with fewer hands or crews to operate them, thereby to some extent decreasing the expense to the railway company in transporting the cotton to market, with the further effect of leaving to the railway company, for its use and for the benefit of the public, more surplus cars and rolling stock that may be serviceable in the general traffic of the road. The compression of cotton is beneficial to the public in many ways, notably in that, in reducing its bulk nearly one-half, it can be more expeditiously transported to market and more readily handled. And as a fact we can conclude that the rules requiring compression at compresses nearest point of shipment will so distribute the cotton at compresses along the lines of road as will prevent blockades, and will sooner cause its compression than would be the case if hauled to Houston and Galveston for compressing, for the time required in making the haul to those points could be devoted, in many cases, to compressing cotton, if immediately delivered by the railway company to the nearest compress after receiving it.
We also find that in order for the railway company to comply with the Commission rules it will be put to some inconvenience and delay in switching cars and placing them at the compress at points on the line of its road where they have no switch crews, and that this will be attended with some extra expense to the railway company, greater than would be the case if they were allowed to transport the cotton directly to Houston for *Page 134 
compression; and that at some of these compress points they have no regular switching crews stationed, but at some of the compress points on the line they have switch crews, and at such places this delay and extra expense will not occur.
We also find that the compresses at Houston, where the railway company usually delivers most of its cotton hauled from interior points for compression, are able usually to compress the cotton transported over the appellee's road, and are able to compress cotton to an equal or greater density than required by the Commission rules, and that the railway company have better facilities there for handling cotton than at some interior compress points on its line of road, and can handle the cotton to be compressed there possibly cheaper than at points on the line of its road where it has no switching crews.
These findings are in some essential features different from those found by the trial court. That court, in effect, found that no public interest would be subserved from an enforcement of the rules and regulations requiring the road to deliver cotton for compression to the compresses on its line, and also found that as much cotton when uncompressed could be transported on flat cars as when compressed.
It should not require argument to demonstrate that much benefit results from the compression of cotton to a density that practically reduces its bulk one-half, and we do not desire, upon this point, to add anything to what has been said in our findings of fact.
The finding that as much cotton when uncompressed can be transported on a car as when compressed is clearly opposed to physical laws, and all rules of common experience, and general knowledge that is supposed to be possessed by all men of ordinary intelligence. If the compression of the cotton reduces its bulk one-half, the space for it to occupy upon the car will be reduced in a like proportion; hence it logically follows that more bales when compressed can be loaded on a car than when not compressed. It is not contended by anyone that an ordinary car can not bear and support a weight much greater than that of a carload of uncompressed cotton; but from the facts we can well assume that a car will support all of the weight of any number of bales, whether compressed or not, that can with safety to their equilibrium be placed upon it.
The court in some of its finding of fact points out what it conceives to be certain benefits to shippers and cotton buyers if the railroad could transport cotton unhampered by the Commission rules and have it compressed at points selected by the road. This much of the findings are simply deductions from the facts, and are more in the nature of an argument or theory than properly the ascertainment of facts. And further, they need not be considered in determining if the rules and regulations are unjust and unreasonable to appellee, as they have little, if any, relevancy to that question.
There are other findings by the trial court, to the effect that the compression of cotton at Houston, where the railway was having most of it done, was more beneficial to the shipping public than if compressed at the places on the line of road as required by the Commission rules, and *Page 135 
that this was done with less cost and expense and inconvenience to the railway company. The fact is, this was evidently the main ground upon which the court below reached its conclusion that it would be unreasonable and unjust to appellee to enforce against it the rules and regulations in question.
Since the decision of the Supreme Court holding that the Commission had the authority to make rules and regulations requiring cotton to be compressed at the nearest compress points on the line of road after being received by the railway company, and in view of the undeniable proposition that the compression of cotton results in much benefit not only to the shipping public but to the carrier, the conclusion must be admitted that the trial court, when it in effect held that cotton could be more advantageously compressed at Houston than at the points required by the rules, and made the invalidity of the rules rest upon this effect, substituted its judgment and opinion upon this point for that of the Commission; and the effect was to declare that the rules promulgated by the Commission were not the best and wisest in the interest of all parties that could have been made upon that subject; that they made the mistake in not selecting Houston as the point for compressing cotton, instead of the interior compresses on the line of road.
The Commission in making the rules and regulations were in the exercise of a jurisdiction over a subject about which it was permitted to exercise some discretion; and if it is admitted that it could require the railway companies to cause the cotton to be compressed, and that some public benefits would result therefrom — which is undeniable — it was clothed with the authority, in the exercise of its discretion, to select places where this service should be performed. The fact that the points selected were not the best under the circumstances, and that the rules were not the wisest that could have been made, are not grounds for setting aside the entire rules and leaving the railway company entirely free of its duty to the public in the compression of cotton. The public duty which must be admitted may be forced upon the carrier in this respect can not be cast off because it is not permitted in its own way, and at places of its own selection, to perform it, or because the authority which may require it to perform this duty has not acted as wisely in the premises as it might have done.
The Supreme Court of Minnesota, in State v. Vandersluis, 42 Minnesota, 131, in passing upon the reasonableness of rules relating to the practice of medicine, says: "The only limit to legislative power in prescribing conditions to the right to practice in a profession is that they should be reasonable. Whether they are reasonable — that is, whether the Legislature has gone beyond the proper limits of its power — the courts must judge. By the term reasonable we do not mean expedient, nor do we mean that the conditions must be such as the court would impose if it were called on to prescribe what should be the conditions. They are to be deemed reasonable when, although perhaps not the wisest and best that might be adopted, they are fit and appropriate to the end in view, *Page 136 
to wit, the protection of the public, and are manifestly adopted in good faith for that purpose."
Now the rules of the Commission are manifestly in the interest of the public, and are such that the Supreme Court have determined they had the power to make, and the fact that others could have been made better adapted to the circumstances and wiser in some respects would not authorize the courts to relieve the railway companies entirely from their operation and to leave the right to have cotton compressed dependent solely upon the wish and will of the carriers; for the effect of such ruling would be to overthrow the doctrine that the Commission has the power to make rules regulating that matter, and would place the railways in a position to escape the effect of the regulations whenever they could show that wiser and better rules could have been made. Vesting this Railroad Commission with the authority to make rules and regulations concerning the compression of cotton was the remedy wisely provided to compel the railway companies to perform a service and duty which, before, they only performed when they desired to do so. The purpose was to remove this matter entirely from the discretion of the railway companies and to require of them the performance of this duty whether they desired to do so or not, subject only to the limitation that the rules and regulations looking to this end must be reasonable and just to the carriers.
The law places upon the railway company the burden of proving that the rules and regulations are unjust and unreasonable when applied to it. And when we keep in view the public interest intended to be subserved by these rules, proof of facts tending to show that better and wiser rules could have been made does not satisfactorily establish the proposition that those in use are unreasonable and unjust. The most that may be said in such a case is that the rules do not operate as advantageously as would have been the case if different rules, or no rules at all, had been adopted. But this alone falls far short of establishing that those in actual operation, for this reason, are inherently unjust and unreasonable. The enforcement of the rules as made and existing will subserve a useful purpose, and because other rules, if made, would serve a better purpose, does not justify the court in holding that for this reason the existing rules are not reasonable, and to bring about a condition that will relieve the railway company from the operation of any rules and regulations concerning this matter.
It is also contended that the railway company should be relieved from the operation of these rules, because to observe them would be at the increased expense and inconvenience to the company, without an equal corresponding benefit to the public.
There would be much force in this contention in tending to establish that the rules and regulations were unjust and unreasonable if an observance of them would occasion a gross or unreasonable disproportion between the benefits to be received by the public and the carrier and the expense and inconvenience to the company. But the facts in the record do not show such to be the case. In the nature of things, it is difficult, in a case of this character, to put a pecuniary value upon the benefits to *Page 137 
result to the public, or to ascertain with accuracy just to what extent will be the value of the benefits received by the public; but, as before said, it can be readily perceived that the compression of cotton results in some benefit to the public as well as to the carrier, but there is no standard by which it may be measured in dollars and cents. And in this respect it is like many duties and services that must be performed by the carrier in the interest of the public, and in which the public interest is admitted, but can not be appreciably measured by any pecuniary standard. Between the benefits received on the one hand and the attendant expenses on the other, there is no general rule of average or equality that will aid us in this class of cases; and all that is required is to ascertain if the public have an appreciable interest in the performance of the service, and whether its cost and expense will be so great and burdensome as to render it unjust that the carrier should bear it. The evidence upon this question, when considered in an aspect most favorable to the appellee, simply establishes that to observe the rules would burden the railway company with an additional expense at compress points where they have no switching crews, and would cause a delay and inconvenience in the movements of its trains. That branch of the evidence which tends to show that the public would be as well served and as much benefited by permitting the railway to carry the cotton to Houston in violation of the rules, and there have it compressed, has been disposed of by what has been previously said upon that question. The evidence does not show that the delay and inconvenience occasioned by sidetracking cars at compress points would seriously embarrass the appellee in the movements of its trains. Nor does it appear that the cost and expense attendant upon that service stands in a disproportionate ratio to the benefits to be received by the company and the public from its performance. It is not shown that the expense in this respect is very much greater than that incurred by the railway company in placing shipments of other commodities in carload lots on sidetracks at stations where destined. There are many services and duties which the railway companies must perform at a cost and expense to them in the interest of the public. And it has never been successfully contended that they are absolved from the duties resting upon them in these respects because their performance is attended with expense. Under the law, when circumstances authorize it, the railway is required to transport freight in carload lots; and it is well known that these cars are delivered to the stations where billed and there sidetracked by the railway company in order to be unloaded, or if not sidetracked, and the company wishes that the car shall remain in the train, the train is there delayed until the car is unloaded. The railroad companies have never urged, nor can they successfully urge, that they should not be required to transport in carload lots because the delay and switching of the car at point of destination or having it unloaded there will result in inconvenience and expense to the company. The interest of the public requires of the railway companies that they shall maintain their tracks and rolling stock in a reasonably safe condition, and that they shall offer to the public adequate and proper facilities for transportation, and they are *Page 138 
required, in the pursuit of diligence and care, to do many other things. All of these duties occasion an expense to the railway companies. Without doing these things and performing these duties the railway companies could possibly operate their roads at a less cost and expense; but in this age it is not seriously contended that the extra cost and expense connected with the observance of these duties and services will excuse the roads from performing them. In the performance of these duties it is difficult to determine the extent of the benefits to result to the public, but in a general way it must be admitted that to some extent it exists, but the difficulty lies in ascertaining the extent of it and measuring it. But the recognition of the existence of some appreciable benefit to result to the public from the performance of many of these duties removes the only obstacle in the way requiring their performance. The moment it is admitted that the public interest requires the service, the railway company must stand ready to perform it; and the fact that this may occasion a reasonable cost and expense will not relieve the railway from its duty in the premises.
We have not been able to find a case exactly in point — that is, a case where this identical question was involved — but many cases may be found where municipal ordinances and resolutions have been attacked on the ground that they were unreasonable, and which have been sustained because they served a public purpose. And the facts that the persons who fell within their operation were charged with additional burdens and expense and deprived of some rights and privileges which they had before enjoyed were not obstacles in the way of the enforcement of the ordinances, and were not substantial reasons for holding them unreasonable. Many cases on this line are collated in 17 American and English Encyclopedia of Law, pages 248 to 250. By analogy these cases have some bearing on the question under discussion; for, as previously stated, the application of the rules of construction as to ascertaining if an ordinance is unreasonable should be applied in an effort to discover the effect of the rules and regulations of the Commission.
For the reasons stated, the judgment of the court below is reversed, and judgment here rendered to the effect that the appellee take nothing by its suit, and that the appellant go hence, and that the decrees and orders enjoining the appellant from enforcing its rules be vacated and set aside. The cost of this appeal, as well as that of the court below, is taxed against appellee.
The judgment we hereby render is without prejudice to appellee to pursue any remedy it may have in the future to enjoin the enforcement of the Commission rules if, by reason of subsequent facts, they should become unreasonable or unjust to appellee.
Reversed and rendered.
 OPINION ON MOTION FOR REHEARING.